IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 4:05CR3072 |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM** |
| vs. | ) | **AND ORDER** |
| | ) | |
| CLAUDE SLEDGE, III, | ) | |
| | ) | |
| Defendant. | ) | |

The indictment in this case charges the defendant with possessing over 5 grams of crack cocaine with intent to distribute. The government also requests forfeiture of $229 that the defendant was carrying at the time of his arrest.

Following an evidentiary hearing, Magistrate Judge Piester has filed a report and recommendation (filing 26), recommending denial of the defendant's motion to suppress all evidence derived from a warrantless search of the defendant's person (filing 14). Pursuant to NECrimR 57.3 and 28 U.S.C. § 636(b)(1), the defendant has filed a statement of objections to the report and recommendation (filing 29). The government has not responded to the defendant's objections.

Upon de novo review, I will sustain the defendant's objections in part and will not adopt the Magistrate Judge's report. I will, however, adopt the recommendation that the defendant's motion to suppress be denied in all respects.

### *Preview of Decision*

The rationale for the denial of the motion to suppress requires a lengthy and tedious description of the facts that led up to the arrest. That rational also requires a careful analysis of the Nebraska laws regarding suspects who refuse to cooperate

with the police.  Furthermore, the rationale that I apply differs from Judge Piester's analysis.  As a result, a preview of my decision is helpful.

The logic of this opinion can be summarized in these five bullet points, to wit:

- Even if an initial stop and arrest of a suspect is invalid, the suspect's resistence to arrest provides independent grounds for an arrest and subsequent search of the suspect's person.  <u>See</u>, <u>e.g.</u>, <u>United States v. Dawdy</u>, 46 F.3d 1427, 1431 (8th Cir. 1995).

- Mr. Sledge was not entitled to resort to the self-help remedy of running away from an unlawful pat-down search.

- Had he not run away, the exclusionary rule would apply to prevent any items seized from being used in evidence.

- By running away, Mr. Sledge provided the officers with probable cause to arrest him for obstructing a peace officer and thereafter a justification to search his person.

- Even though the police cited other grounds for the arrest, the search conducted incident to the arrest was lawful.

### *Factual Background*

After reporting for duty at 11:00 p.m. on May 4, 2005, Officer Robert Smith of the Lincoln Police Department drove his cruiser to the vicinity of N Street Drive-In Liquor, located at the corner of 19th and N Streets in Lincoln, Nebraska.  He parked his cruiser in a used car lot that was catercorner to the liquor store, and, as was his practice, sat and watched as cars entered the store parking lot and as people entered the store.  Officer Smith testified that he routinely conducted surveillance at this

location, and at another liquor store in the same neighborhood, to watch for wanted vehicles and persons, and also to watch for minors attempting to buy alcohol. He used binoculars to read license plates and a mobile data computer to "run" the plates and to obtain any criminal information on the registered owners.

At about 12:15 a.m. on May 5, 2005, Officer Smith observed a car pull into the parking lot in front of the liquor store. The car had tinted windows but Officer Smith thought there were four occupants. A man who appeared to be "in his early 20's or close to 20" (Tr. 11:24) exited the car from the front passenger seat and entered the liquor store. He soon returned, empty handed, and got back into the car.

While the man was inside the store another car had arrived and parked two stalls to the right of the first car. After the man returned, the driver of the second car got out and walked over to the passenger side of the first car. Officer Smith did not immediately recognize this individual, who was later identified as Tetus Therien. Officer Smith also was unable to read the cars' license plates.

Officer Smith observed Mr. Therien engage in a conversation and then shake hands with, or possibly take "money or something" from, someone sitting somewhere in the first car. (Tr. 13:19) Mr. Therien then entered the liquor store and, a short time later, came out carrying an 18-pack of beer. After another brief "hand exchange" (Tr. 14:15), the right rear passenger door of the first car was opened and Mr. Therien handed the beer inside. After another short conversation with someone sitting in the first car, Mr. Therien returned to the second car.

Officer Smith decided at this point to find out whether he had just witnessed the procurement of alcohol for a minor. He drove his cruiser across the street and parked directly behind the first vehicle, preventing it from leaving. He got out and walked over to the second vehicle to ask for Mr. Therien's identification. He then moved to the open passenger side window of the first car and asked its driver, a young female, for her identification. While doing so, he recognized the defendant,

Claude Sledge, III, and another man, Fred Baxter, sitting in the back seat.  Officer Smith had arrested both men on several prior occasions and recalled that the Lincoln Police Department had active broadcasts on them.  He confirmed this by calling "channel 50" on the police radio.  Officer Smith also radioed for assistance "to kind of even the odds."  (Tr. 20:15.)  Three officers responded almost immediately, followed a few minutes later by three more officers.

Officer Smith knew that Mr. Sledge and Mr. Baxter were both "well over" 21 years of age, and because the 18-pack of beer appeared to be unopened, sitting by Mr. Baxter's feet, he had no occasion to cite Mr. Therien for purchasing the beer. After determining that Mr. Therien had no active broadcasts, Officer Smith permitted him to leave, but required a female passenger in the second car to drive it away because Mr. Therien's license was suspended.

Officer Smith decided to deal with Mr. Baxter's broadcast next, so he had him get out of the car while directing one of the other officers, John Clarke, to stand by the left-rear door of the vehicle.  This direction was given because Officer Smith was "concerned that Mr. Sledge might get out and try to take off."  (Tr. 25:3-4.)

Mr. Baxter had an active broadcast for "unauthorized use of a propelled vehicle, to be cited regardless."  (Tr. 23:17-18.)  Officer Smith explained that "cite regardless means that no matter what [the individual subject to the broadcast] says, . . . there's enough probable cause based on the initial officer's report to issue a citation regardless of any statement that individual might make."  (Tr. 24:11-17.)

While talking to Mr. Baxter about his broadcast, which concerned his failure to return a girlfriend's car when he was supposed to, Officer Smith heard Officer Clarke ask Mr. Sledge to get out of the car.  He was unable to hear the ensuing conversation, but a few moments later saw Mr. Sledge turn his back toward Officer Clarke, who then began a pat-down search.  The next thing he observed was "Mr. Sledge turn and try -- what appeared to me, to turn to try and run away, and Officer

Clarke grabbed him, then there was a struggle between Officer Clarke, Officer Kocian, and Mr. Sledge." (Tr. 27:2-6.)  A third officer then "ran over and the four of them went down in a pile." (Tr. 27:8-9.)  "[W]hen they stood [Mr. Sledge] back up, he had handcuffs on." (Tr. 27:20-21.)  Mr. Sledge was then taken over to one of the many cruisers that were on the scene.

Officer Smith returned his attention to Mr. Baxter, while directing another officer to check the identification of the man in the front passenger seat who had gone into the liquor store earlier.  Mr. Baxter "was cited and released for the unauthorized use." (Tr. 29:23-24.)  The other man, who was determined to be 20 years old, was cited for giving false information to the officer by using his brother's name, and was arrested because he "had an active warrant for his arrest in western Nebraska." (Tr. 29:9-15.)  The driver of the vehicle "was released from the scene without charge or citation." (Tr. 30:6-7.)

Officer Clarke testified that he heard the "channel 50" call and thus was aware that Mr. Sledge had two active broadcasts, a "cite regardless" broadcast for possession of marijuana, and a broadcast that he be interviewed concerning some disturbance.  Officer Smith clarified that the charge of marijuana possession was a misdemeanor infraction, and that the broadcast only directed that Mr. Sledge be issued a citation, not placed under arrest.[1] (Tr. 46:3-14.)  Officer Smith described the second broadcast as being a "with admission" broadcast (Tr. 23:20), presumably indicating that a citation should be issued if Mr. Sledge admitted his involvement in the disturbance.  Neither Officer Clarke nor Officer Smith had any personal knowledge about the events that led to the broadcasts. (Tr. 49:3-5; 81:19-22.)  The marijuana possession broadcast was issued on March 14, 2005. (Tr. 52:14-22.)

─────────────

[1] See Neb. Rev. Stat. Ann. § 28-416(13)(a) (LexisNexis 2003) (first offense possession of less than an ounce of marijuana is infraction); Neb. Rev. Stat. Ann. § 29-435 (LexisNexis 2003) (generally, citation shall be issued in lieu of arrest for infraction).

Officer Clarke testified that he also was familiar with Mr. Sledge and Mr. Baxter from several prior contacts.  (Tr. 59:13-21.)  He stated that Mr. Sledge's history gave him cause for concern, explaining that:

> Claude has a -- according to our computers, a gang indicator.  It's a G flag is what we call it.  And due to other contacts I've had with Claude, I've seen his resistive behavior.  His verbal and actual physical resistive behavior in past incidents that I've been involved in and I've heard from other officers.

(Tr. 68:14-20.)

Officer Clarke testified that following the "channel 50" call he was asked by Officer Smith "to go and stand over by the driver's side rear of the vehicle behind it, because Officer Smith felt that both parties may run or one of them may run."  (Tr. 60:16-20.)  According to Officer Clarke, "[i]t was then determined that we were going to contact both Claude Sledge and Freddie Baxter," so he asked Mr. Sledge to step out of the vehicle and advised that there were a couple of broadcasts that they needed to talk about.  (Tr. 61:2-62:3.)  His direct examination continued as follows:

> Q. (By the prosecutor) Okay. You -- you -- I think the last question you were -- he'd gotten out of the vehicle and you were telling him what -- what -- what was going on basically?
>
> A. Yes.
>
> Q. Go ahead. Go ahead from there.
>
> A. I -- I explained to him that he had a couple broadcasts and I needed to talk to him about that. I asked him to back away from the vehicle, and he did.  I then told him that he needed to receive a citation for one of them.  He became very angry about that. I explained to him it was a reference having some marijuana in his hygiene kit at the jail, apparently when he was incarcerated.
>
> Q. Okay.

-6-

A. And he -- he was very angry about that, asking me why he wasn't cited or arrested at the time.  And I told him, you know, hey, it was just, you know, something we needed to take care of.  I need to interview you about the other broadcast.  And then I asked him if I could pat him down.

Q. And did he answer you?

A. He did, yes.

Q. What did he say?

A. Yes, I could.

Q. And in reference to that, what next occurred?

A. I asked him to turn around and he complied and turned around, and I told him to put his hands up, and I tried to pat him down.

Q. All right.  At any point did you grab ahold of him and turn him around?

A. No, I didn't.

Q. At any point did you lift his arms up?

A. No.

Q. Did he do all that on his own?

A. Yes, he did.

Q. After he said that you could pat him down?

A. Yes.

Q. And did you begin the pat down?

A. Yes.

-7-

Q. And what occurred?

A. I started to pat him down and he -- he was still talking to me and he initially threw his arms down, and I didn't even get to -- to fully pat him down at all.  I'd just started. I asked him to put his hands up again.  He did.  And then he proceeded to put them down again.  As I started to go down from his upper torso of the back down, he -- he threw them down again.  I told him to stop doing that and put his hands up.  And he started kind of twitching and moving and keeping his left arm down.  And I never completed my pat down, and then he took off running.

Q. He -- he ran away from you?

A. Yes.

Q. How far did he get?

A. Approximately 5 yards.

Q. And what happened?

A. I grabbed him from the back of the shirt, and Officer Kocian and Officer Peterson assisted me and we took him to the ground.  He was then handcuffed.

Q. Did -- was he under arrest at that time?

A. Yes, he was.

Q. For what?

A. He was under arrest for failing to comply and resisting arrest.

(Tr. 62:19-65:10.)

Officer Clarke acknowledged on cross-examination that the failure-to-comply charge concerned Mr. Sledge's "failure to comply with [Officer Clarke's] commands to put his arms back up to allow [Officer Clarke] to pat him down."  (Tr. 71:12-15.)

-8-

On cross-examination he also once again reviewed the events immediately preceding Mr. Sledge's arrest, testifying as follows:

> Q. (By defense counsel)  All right. So you walk up to the driver's side rear passenger where he's seated; is that right?
>
> A. Yes.
>
> Q. And do you recall exactly what you said to him when you approached?
>
> A. I said, Claude can you step out of the car?
>
> Q. Did he respond?
>
> A. He started to step out of the car and I advised him what was -- what this was about.
>
> Q. Okay. Did he -- is that because he asked?
>
> A. Because he what?
>
> Q. Did he ask why he needed to step out?
>
> A. Well, I told him that he had a broadcast, couple broadcasts.
>
> Q. I understand that. But did he ask?  Did you tell him that because he asked what -- why do I have to step out?
>
> A. I -- I don't remember if he did.  I asked him to step out and he stepped out of the car.
>
> Q. Okay. Did he appear happy about it?
>
> A. No.
>
> Q. Okay. Did he ask if he could stay in the car?

A. No.

Q. He followed your direction to get out.

A. Yes.

Q. What makes you say he was unhappy?

A. Any time that I've ever had a contact with Claude he has been unhappy. Any time he has a contact with police, he's usually unhappy.

Q. Not -- not a real compliant individual?

A. No, he's not.

Q. All right. And so you told him that he had a broadcast.

A. Yes.

Q. And do you recall exactly what you told him about the broadcast?

A. I told him that he had two broadcasts. One broadcast was for him to be cited regardless for marijuana possession.

Q. Okay. And he stepped out of the vehicle; is that right?

A. Yes.

Q. And how did he respond to the information you provided regarding the marijuana charge?

A. He was angry about it.

Q. Did he raise his voice?

A. Yes, he did.

Q. What did he say?

-10-

A. He stated that he couldn't understand why he didn't get a ticket during the time that this happened.  And I told him -- I explained to him that that had nothing to do with me, I'm just, you know, following up on this broadcast.

(Tr. 78:22-79:25.)

Q. Do you remember what he said?

A. I explained to you already that he was -- couldn't figure out why he didn't get a ticket at the time that he was incarcerated.  He was angry about that.

(Tr. 80:22-81:1.)

Q. How did you respond to -- to him saying that?

A. I explained to him again that I -- I don't know, it's -- it wasn't my case.  It was -- I wasn't the investigating officer on it, I didn't investigate it.  I was doing what the broadcast said.

(Tr. 81:4-9.)

Q. Okay. All right. And so your testimony is that at some point you asked if he could -- you asked if you could pat him down; is that right?

A. Yes.

Q. And then after that he -- he turned around.

A. Yes.

(Tr. 81:23-82:3.)

Q. And did you tell him to put his hands up?

A. Yes.

Q. Did he put his hands up?

-11-

A. Yes, he did.

(Tr. 82:21-24.)

Q. Okay. And after he turned around and put his arms up you started to pat him down; is that right?

A. I tried.

Q. Did he still seem upset?

A. Yes.

Q. Still seemed angry about the broadcast?

A. Yes.

Q. Still seemed noncompliant with your request to get out of the car and be pat down?

A. Yes, he wasn't complying.

Q. Okay. And you began to pat him down; is that right?

A. I tried.

Q. Did you start -- where did you start?

A. The upper torso, upper behind the shoulders, behind his -- where his armpits would be.

Q. Did you pat there?

A. Tried.

Q. Okay. What happened?

A. He put his arms down.

-12-

Q. Okay.

A. And started kind of moving around behind me, moving his head back and forth. I asked him --

Q. Like he was going to turn around?

A. He was being noncompliant. I told him to put his hands up again, and it -- it -- I wasn't sure what he was doing.  Alls (sic) I know is it made me feel nervous.

Q. Did it indicate to you that he didn't want you to pat him down?

A. Yeah.

Q. Did you stop patting him down?

A. No.

Q. What did you do?

A. I asked him to put his hands up, he put them up again, and I tried again the second time.

Q. Did he put his hands down again?

A. Yes.

Q. What did you do?

A. Well, I asked him a third time to do it, and he didn't do it, and then he ran away from me.

Q. Okay. And so after he put his hands down the second time, did you tell -- tell him to put them back up again?

A. I don't recall if I did for sure.

(Tr. 83:11-85:5.)

Q. Do you remember how many times he put his hands down before he was arrested?

A. Before he ran away?

Q. Officer, do you remember how many times he tried to put his hands down --

A. It was either two to three times, sir.

(Tr. 85:13-18.)

Q. And after the second time, what did you do?  Do you know?

A. I asked him to put his hands up, and I told him that he needed to stop doing what he was doing.

Q. Okay. Did you tell him that if he didn't stop doing what he was doing you were going to place him under arrest?

A. Yes.

Q. And when you told him that, did he put his arms back up?

A. No, he put them down and he ran away.

Q. Okay. Well, but you said he put -- they were down, right? The second time they were down, they came down, right?

A. Correct.

(Tr. 85:25-86:14.)

Q. Right?  And that's when you say, Claude, put your arms back up or we're going to place you under arrest, fair enough?

A. Yes.

(Tr. 86:17-20.)

-14-

Q. My question is, what did he do in response to that statement by you?

A. He -- he put them up and then I went to try to pat him down again --

Q. Let me -- okay, let me stop you. So he put his arms back up.

A. Yes.

Q. Okay. So after the second time he put them down, he put them back up again, right?

A. Yes.

Q. Okay. And then did you start to pat him down again?

A. Started to try to pat him down, yes.

Q. Okay. Did you attempt to pat the pocket area of his pants?

A. Sir, I never got -- I -- I tried to --

Q. Yes or no.

A. Yes, I tried.

Q. Did you pat the pocket area of his pants?

A. No, I didn't. I tried.

(Tr. 87:4-23.)

Q. Okay. And so after he puts his arms down twice, you tell him he's going to -- you're going to arrest him if he keeps doing that, he puts them up again, you start patting him down, you said you weren't able to, what happened?

A. He ran away.

Q. Okay. And you placed him under arrest.

-15-

A. Yes.

(Tr. 88:18-25.)

Q. Where was Officer Kocian while all this was transpiring?

A. He, I believe, was behind me to the right of me. He was definitely to the right and behind.

Q. Okay. Within a few feet?

A. Yeah. Actually, as I was trying to pat him down and things weren't going like they procedurally do, Officer Kocian did come in closer.

Q. Okay. And so during this time period where Mr. Sledge is putting his arms down and you're telling him to put them back up, Officer Kocian comes closer?

A. Yes.

Q. Were you ever suspicious that he was trying to hide something?

A. Yes.

Q. All right. When Officer Kocian came closer and you were telling Mr. Sledge to keep his arms up or you would arrest him, did Kocian grab him?

A. No.

(Tr. 89:1-20.)  After reviewing a written report, however, Officer Clarke changed this testimony regarding Officer Kocian's actions:

Q. (By defense counsel)  In fact, [your supplementary report] says, I advised him that if he continued this we would just go ahead and put handcuffs on him and stop.  Next sentence, Officer Kocian then grabbed him and I became very suspicious of the way he was acting and felt

-16-

concern for my safety and wondered what he was trying to hide, then he attempted to run. Is that right?

A. Yes.

Q. And so according to your supp report that you reviewed prior to testifying here today, Officer Kocian grabbed Mr. Sledge before Mr. Sledge made any effort to run; is that right?

A. Yes. I'm testifying to that, yes.

Q. Thank you.  Prior to Mr. Sledge trying to get away from you two, did he ever attempt to assault you?

A. No.

Q. Did he ever verbally threaten you?

A. After he was arrested and handcuffed he made several threats.

Q. Not what I asked you. Did he ever threaten you prior to him making an effort to run away?

A. No.

Q. And when he was arrested he was upset, wasn't he?

A. He was upset from the initial contact to the end of the contact to the point in time he was placed in jail, he was upset.

Q. And, in fact, your report indicates that when he was arrested he was yelling, screaming, upset and irate when he was arrested.

A. Yes, he was.

Q. Your report also indicates that from the beginning of your contact with him when you asked him out of the car he was verbally noncompliant.

-17-

A. Correct.

(Tr. 91:22-93:8.)

When asked on direct examination if he ever feared for his safety during his encounter with Mr. Sledge, Officer Clarke replied that he did.  These questions and answers followed:

Q. When -- when did that happen?

A. Initially right when I patted him down and then he put his hand down, his arm down. And then I tried again and he did it again. At that time I began to wonder if he had a handgun on him.

Q. Okay. And then he took off?

A. Yes.

(Tr. 66:22-67:2.)

Finally, Officer Clarke testified that after Mr. Sledge was handcuffed and placed under arrest, he was escorted over to a cruiser and searched "incident to arrest."  (Tr. 65:21.)  The officers "located two baggies in his left [front pants'] pocket and one baggie in his right [front pants'] pocket of an off-white substance" that field tested positive for cocaine base.  (Tr. 65:24-66:1, 66:11-16.)  The officers also found $229 in cash in his left front pants' pocket.  (Tr. 93:9-16.)

Mr. Sledge testified that Officer Clarke did not ask permission to conduct the pat-down search, but simply ordered him to turn around, which he did (Tr. 126:16-127:4; 127:18-23; 136:17-25); that after he was patted down once Officer Clarke began digging in Mr. Sledge's left front pants' pocket and questioning him how much money he had (Tr. 127:6-10; 128:18-22); that Mr. Sledge told Officer Clarke to stop digging in his pocket and then "brushed" or "swiped" at Officer Clarke's hand and tried to move away from him, at which time Mr. Sledge was forcefully taken to the ground (Tr. 127:11-13; 128:21-129:16; 139:19-140:6).

-18-

The driver of the first vehicle, 19-year-old Jennifer Carriker, testified that she did not hear Officer Clarke ask Mr. Sledge to consent to a pat-down search (Tr. 103:11-18; 105:9-20; 112:7-8); that after the pat-down search began Mr. Sledge's arms "slightly moved down as if he was uncomfortable with it, and the officers were telling him to put his arms back up" (Tr. 103:19-25); that the officers were also asking Mr. Sledge what he was hiding, what he had in his pockets, and why he was resisting (Tr. 104:2-7, 16-21); that the officers "were being very aggressive and not friendly or nice" (Tr. 20-21); that while the officers were telling him to put his hands up Mr. Sledge appeared very unhappy and uncomfortable, the officers "were being very cluttering of Claude and not giving him his space," and Mr. Sledge "tried to get away so that the officers weren't around him" (Tr. 116:16-24); and that Mr. Sledge only took two or three steps before the officers grabbed him and took him to the ground (Tr. 120:6-13).

## Magistrate Judge's Report and Recommendation

Judge Piester announced his findings and conclusions at the end of the evidentiary hearing (Tr. 150:25-155:11) and also made some additional findings in his written report and recommendation (filing 26).  Essentially, Judge Piester determined that:  (1) Officer Smith had reasonable suspicion to investigate whether beer had been purchased for a minor; (2) Officer Smith had reasonable grounds to detain Mr. Sledge based on the active broadcasts; (3) the evidence is unclear whether Mr. Sledge verbally consented to a pat-down search, but initially he was compliant; (4) Officer Clarke could perform the pat-down search without consent because he had cause to fear for his safety; (5) the officers' testimony was credible that Mr. Sledge tried to run away; and (6) the officers had probable cause to arrest Mr. Sledge for failure to comply and resistance.

### *Defendant's Objections*

No objection is made to Judge's Piesters determination that Officer Smith had reasonable suspicion to contact the occupants of both vehicles. Mr. Sledge disputes, however, that there is sufficient evidence to support the conclusions that the officers acted lawfully when they (1) detained him, (2) attempted the pat-down search, and (3) placed him under arrest. Mr. Sledge also disputes two fact findings made by Judge Piester: (1) that he attempted to flee, and (2) that Officers Smith and Clarke knew him to behave aggressively and to be noncompliant when confronted by police.

## DISCUSSION

Because it is the government's theory of the case that the crack cocaine and money were seized incident to a lawful arrest, questions of whether Mr. Sledge was lawfully detained and patted down are important only insofar as they bear upon the question of whether his arrest was lawful.[2]  The government, of course, bears the burden of establishing that an exception to the warrant requirement applies.  <u>See</u> <u>United States v. Hill</u>, 386 F.3d 855, 858 (8th Cir. 2004).  Although I conclude as a preliminary matter that the government has failed to meet its burden of proving the lawfulness of the detention and pat-down search, I ultimately conclude that there was probable cause to arrest Mr. Sledge, and that evidence which was seized from his person following the arrest is admissible.

### *Lawfulness of Detention*

Under <u>Terry v. Ohio</u>, 392 U.S. 1, 20-23 (1968), police officers may briefly detain and ask questions of people whom they reasonably suspect of criminal activity.

---

[2] The fact of a lawful arrest, standing alone, authorizes a search.  <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 35 (1979).

-20-

The standard for reasonable suspicion is less demanding than that for probable cause; it requires only "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." United States v. Chhunn, 11 F.3d 107, 109-10 (8th Cir. 1993), quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir.1983).  As noted above, Mr. Sledge does not dispute that Officer Smith had reasonable suspicion to investigate a possible liquor law violation.  The evidence establishes, though, that Officer Smith quickly determined he did not have probable cause to cite anyone for the transaction involving Mr. Therien that he had witnessed from across the street,[3] and that his continued detention of Mr. Sledge was based solely on the active broadcasts.

An officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct. United States v. Cortez, 449 U.S. 411, 417 n. 2 (1981).  In particular, "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information." United States v. Hensley, 469 U.S. 221, 232 (1985) (citations omitted).  On the other hand, "[i]f the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." Id. (noting, however, that in such a situation the officers making the stop may have a good-faith defense to any civil suit).

"Assuming the police make a Terry stop in objective reliance on a flyer or bulletin, . . . the evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop, . . .." Id., 469 U.S. at 233 (emphasis in original).  See also United States v. Thompson, 906 F.2d 1292, 1296 n. 7 (8th Cir. 1990) (officer was entitled to rely on

---

[3] Officer Smith testified that "[t]he only offense that would've occurred would've been the initial individual who went in who was a minor attempting to purchase alcohol."  (Tr. 17-19.)

information transmitted over an all-points bulletin as long as the originator of the radio bulletin had reasonable suspicion to believe a crime would be or had been committed).  Cf. United States v. Jacobsen, 391 F.3d 904, 906 (8th Cir. 2004) ("Admissibility does not require that those acting on the flyer themselves know the specific facts prompting the flyer, if some degree of communication exists between the police officers.").

While it appears that Officers Smith and Clarke detained Mr. Sledge in objective reliance upon the two active broadcasts, there is no evidence in the record from which it may be concluded that the unidentified officers who issued the broadcasts were justified in doing so.  For Fourth Amendment exclusionary rule purposes, therefore, it must be assumed that Mr. Sledge was being unlawfully detained when Officer Clarke asked him to step out of the car to discuss the broadcasts.  See, e.g., Joshua v. DeWitt, 341 F.3d 430, 451 (6th Cir. 2003) (applying exclusionary rule and granting habeas relief where state prosecutor at suppression hearing failed to comply with Hensley by presenting proof that the issuing officer had reasonable suspicion to issue a bulletin that resulted in petitioner's detention by another officer).

### *Lawfulness of Pat-Down Search*

A defendant's voluntary consent to be searched is an exception to the Fourth Amendment's warrant requirement.  United States v. Esquivias,  416 F.3d 696, 700 (8th Cir. 2005), citing Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  The Government bears the burden of proving voluntary consent by a preponderance of the evidence and must show that the defendant behaved in such a manner that the officer reasonably believed that the search was consensual.[4]  Id.  A court determines whether

---

[4] In evaluating the reasonableness of the officer's belief, a court must consider the characteristics of the person consenting, "including the party's age, intelligence and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights

consent is voluntary under the totality of the circumstances.  Id.  Consent can be inferred from words, gestures, and other conduct.  United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001).

Where, as here, the search follows an unlawful detention, it is the government's burden to prove, by a preponderance of the evidence, that the defendant's consent to the search was, in fact, "voluntary in the sense that it was sufficiently an act of free will to purge the primary taint of the illegal seizure."  United States v. Yousif, 308 F.3d 820, 830 (8th Cir. 2002).  "[T]he following three factors should be considered: (1) the temporal proximity between the illegal search or seizure and the consent, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct." Id., citing United States v. Moreno, 280 F.3d 898, 900 (8th Cir. 2002), and Brown v. Illinois, 422 U.S. 590 (1975).

Judge Piester's findings regarding the issue of consent, as expressed at the conclusion of the suppression hearing, are not free from doubt.  He stated:

> The beginning of the search. The evidence is less than clear.  So I'm going to make the assumption that there was no consent.  That from the beginning that the defendant had not verbally consented to that search.
>
> However, by his actions, the defendant was compliant with the officer's instructions in terms of getting out of the car and coming a bit

---

afforded criminal suspects." United States v. Almendares, 397 F.3d 653, 660 (8th Cir. 2005).  The environment in which the alleged consent took place must also considered, "specifically (1) the length of time he was detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded place; and (6) whether he stood by silently . . . as the search occurred." United States v. Smith, 260 F.3d 922, 924 (8th Cir.2001).

away from the car.  And initially, at least, putting his arms out so that he could -- he could be searched.

(Tr. 153:13-22.)

If Officer Clarke's testimony is credited — and Judge Piester offers no reason why it should not be — Mr. Sledge initially consented to the search.  Regardless, it is clear from the evidence that any consent Mr. Sledge may have given, either verbally or by his actions in turning around and raising him arms in response to a search request, was effectively withdrawn a short time later.  Withdrawal of consent need not be effectuated through particular "magic words," but an intent to withdraw consent must be made by unequivocal act or statement.  United States v. Gray, 369 F.3d 1024, 1026 (8th Cir. 2004).  Officer Clarke testified that he understood the first time Mr. Sledge put his arms down that he did not want to be searched, but Officer Clarke continued with the search anyway.  After the second time Mr. Sledge dropped his arms, Officer Clarke threatened him with arrest if he did not comply.  "[I]f a suspect has to be handcuffed to prevent interference with a search of his person, the search was not consensual."  United States v. Sanders, No. 04-3601, ___ F.3d ___, 2005 WL 2319124, *5 (8th Cir. Sep. 23, 2005) (defendant unequivocally withdrew consent by repeatedly moving his hands down to prevent a search of his pockets).

If the officers had reasonable grounds for detaining Mr. Sledge (which has not been proved), then even without his consent they could check for weapons and take any additional steps that were "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop."  Hensley, 469 U.S. at 232.  The justification for a pat-down search or protective frisk is officer safety. United States v. Cornelius,  391 F.3d 965, 967-68 (8th Cir. 2004).  "A protective frisk is constitutionally reasonable when a police officer 'observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous.'"  Id., at 968, quoting Terry, 392 U.S. at 30.

Officer Clarke testified that he only began to wonder whether Mr. Sledge had a handgun after he put his arms down a second time.  He articulated no particular reason for this fear, other than the fact that Mr. Sledge was noncompliant during the pat-down search.  Officer Clarke also expressed a general concern that Mr. Sledge had a gang indicator on his police file and a history of resistive behavior,[5] but he did not state that Mr. Sledge was considered dangerous or was known to carry weapons. Neither of the police broadcasts for which Mr. Sledge was being detained involved serious crimes.

On the record presented, therefore, I conclude that the attempted pat-down search violated the Fourth Amendment regardless of whether the detention was lawful.  Although Mr. Sledge argues that such a constitutional violation requires the granting of his motion to suppress, the determinative issue in this case is whether the subsequent arrest was lawful.

### *Lawfulness of Arrest*

When a defendant commits a new and distinct crime during an unlawful detention, the Fourth Amendment's exclusionary rule does not bar evidence of the new crime.  United States v. Hunt, 372 F.3d 1010, 1012 (8th Cir. 2004).  In other words, "a defendant's response to even an invalid arrest or Terry stop may constitute independent grounds for arrest."  United States v. Dawdy, 46 F.3d 1427, 1431 (8th Cir. 1995).  "In our circuit, resistance to an illegal arrest can furnish grounds for a second, legitimate arrest."  United States v. Schmidt, 403 F.3d 1009, 1016 (8th Cir. 2005) (also stating that whether the defendant was indicted for the new crime does

---

[5] Mr. Sledge objects to a supplemental finding by Judge Piester that Officers Smith and Clarke "knew him to behave agressively."  (Filing 26, p. 1.)  I agree that neither officer said Mr. Sledge had a history of aggressive behavior.  Mr. Sledge also objects to a supplemental finding by Judge Piester that the officers knew him "to be 'non-compliant' when confronted by police or taken into custody."  (Id.)  I think this is a fair description of Officer Clarke's testimony.

not matter to the fourth amendment question, so long as he could have been arrested for it as an objective matter).

In Dawdy, evidence was presented that the defendant had struggled briefly with a state trooper who was trying to handcuff him. While finding that the defendant's arrest for drug possession was based on probable cause, the Court of Appeals found that the defendant's resistance provided additional justification for the arrest, stating:

> The struggle that ensued when the state trooper attempted to handcuff Dawdy, though quickly suppressed, would provide a reasonable police officer with probable cause for arrest under Iowa law. See Iowa Code Ann. § 804.12 (West 1994) (stating that a person is not authorized to use force to resist arrest . . . even if the person believes that the arrest is unlawful or the arrest is in fact unlawful).

Dawdy, 46 F.3d at 1431.

In United States v. Collins, 200 F.3d 1196 (8th Cir. 2000), a police officer on drug interdiction duty at the Kansas City airport became suspicious of the defendant's behavior and asked to search his bags. When the defendant refused, the officer stated that he was detaining the bags for a dog sniff and he asked the defendant to step away. The officer testified that the defendant refused to comply with this request and struck the officer's hand away when he tried to reach for the bags. The defendant was placed under arrest for assaulting a police officer, and an inventory search of the bags was performed by the officer incident to the arrest. Although it was conceded that the officer lacked reasonable suspicion to detain the bags, the Court of Appeals ruled that cocaine discovered during the inventory search was not rendered inadmissible. The Court stated:

> [T]he record establishes that when the officer attempted to place Collins under arrest, Collins "reacted by jerking, and turning away from [the officer], jerking his arm free of [the officer's] grasp [ ][a]nd taking a couple of steps [away]." (Hearing Tr. at 20). Collins's resistance would have provided a reasonable officer with probable cause for arrest under

-26-

> Missouri law.  See United States v. Dawdy, 46 F.3d 1427, 1431 (8th
> Cir.1995); Mo. Rev. Stat. § 575.150.1(1) (Supp. 1998) (person resists
> arrest if the person knows or "reasonably should know that a law
> enforcement officer is making an arrest . . . [and] the person . . . [r]esists
> . . . by using or threatening the use of violence or physical force or by
> fleeing from such officer"); id. § 575.150.3 ("no defense to a
> prosecution [for resisting arrest] that the law enforcement officer was
> acting unlawfully in making the arrest").   Thus, even though the
> officer's initial detention of Collins's luggage was invalid and assuming
> Collins's arrest for assault was also invalid, Collins's "resistance
> provided independent grounds for his arrest, and the evidence
> discovered in the subsequent search[ ] of his [luggage] is admissible."
> Dawdy, 46 F.3d at 1431.

Id., 200 F.3d at 1198.  The Court of Appeals also rejected the defendant's contention
that the arrest was simply a pretext to search his bags, stating that "[a]n officer's
subjective intentions play no role in ordinary, probable-cause Fourth Amendment
analysis."  Id. (internal citations and quotations omitted).

Unlike the Missouri statute involved in Collins, the Nebraska resisting arrest
statute does not make it a crime to flee; rather, some degree of force must be used or
threatened to be used.  See Neb. Rev. Stat. Ann. § 28-904 (LexisNexis 2003) (stating,
in part, that "[a] person commits the offense of resisting arrest if, while intentionally
preventing or attempting to prevent a peace officer, acting under color of his or her
official authority, from effecting an arrest of the actor or another, he or she . . . [u]ses
or threatens to use physical force or violence against the peace officer or another").
See also Neb. Rev. Stat. Ann. § 28-1409(2) (LexisNexis 2003) (stating that the use
of force is not justifiable "to resist an arrest which the actor knows is being made by
a peace officer, although the arrest is unlawful").

An arrestee who struggles with the police and resists handcuffing may be
convicted of resisting arrest in Nebraska.  See, e.g., State v. Campbell, 620 N.W.2d
750, 757 (Neb. 2001); State v. Blair, 433 N.W.2d 518, 520 (1988).  Officer Smith
testified that he saw Mr. Sledge "turn to try and run away, and Officer Clarke grabbed

him, then there was a struggle between Officer Clarke, Officer Kocian, and Mr. Sledge[,]" and then Officer Peterson "ran over and the four of them went to the ground in a pile." (Transcript, 27:3-9.) Officer Smith could not see what happened on the ground, but he observed that Mr. Sledge was handcuffed when the officers stood him back up. (Transcript, 27:19-25.) Officer Clarke's testimony contains no mention of a struggle, however. Officer Clarke testified that he grabbed Mr. Sledge by the back of the shirt and that the other two officers assisted him in taking Mr. Sledge to the ground, where he was handcuffed. (Transcript 65:3-5.) Officers Kocian and Peterson did not testify.

Without some description of Mr. Sledge's actions after he tried to run away,[6] I cannot find that he was forcefully resisting the officers. Thus, even assuming that the officers were "effecting an arrest" when Mr. Sledge attempted to flee,[7] it does not

---

[6] The evidence does not indicate that Mr. Sledge was still being restrained by Officer Kocian when he tried to run.

[7] In State v. White, 306 N.W.2d 906, 909-10 (Neb. 1981), involving a related criminal statute, the Nebraska Supreme Court approved this jury instruction:

> An arrest is taking custody of another person for the purpose of holding or detaining him to answer a criminal charge. It is defined as the taking, seizing, or detaining of the person of another, (1) by touching or putting hands on him; (2) or by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest; or (3) by the consent of the person to be arrested.

> To effect an arrest, there must be actual or constructive seizure or detention of the person arrested, or his voluntary submission to custody, and the restraint must be under real or pretended legal authority. There can be no arrest where there is no restraint or where the person sought to be arrested is not conscious of any restraint. If the person arrested understands that he is in the power of the one arresting and submits in consequence, it is not necessary that there be an application of actual force, in manual touching of the body, or a physical restraint that may

-28-

appear that there was probable cause to arrest him subsequently under § 28-904. Nonviolent refusal to submit to arrest and other minor forms of resistance, such as running from a police officer, are not criminal under § 28-904.  See State v. Hicks, 404 N.W.2d 923, 925 (Neb. 1987) (per curiam).

I am aware from my own research that the City of Lincoln has an ordinance making it unlawful "for any person to intentionally, knowingly, or recklessly assault, strike, physically hinder, delay, interrupt, or in any manner physically oppose any police officer of the city, or any peace officer, in making an arrest."  Lincoln Municipal Code § 9.08.030.[8]  The City of Lincoln also has an ordinance declaring that: "It shall be unlawful for any person to intentionally or knowingly refuse to comply with an order of a police officer made in the performance of official duties at the scene of an arrest, accident, or investigation."  Lincoln Municipal Code § 9.08.050.  It is likely that Officer Clarke was relying upon these ordinances when he arrested Mr. Sledge for resisting arrest and failing to comply, but this fact is not established by the record.  Under Eighth Circuit precedent, I am not permitted (nor

---

be visible to the eye.  The act relied upon as constituting an arrest must have been performed with the intent to effect an arrest and must have been so understood by the party arrested. In all cases in which there is no manual touching or seizure, or any resistance, the intention of the parties are important.  There must have been the intention on the part of one of them to arrest the other and the intent on the part of the other to submit, under the belief and impression that submission was necessary.  However, no formal declaration of arrest is required.

The Nebraska Supreme Court also observed in White that "an arrest is not only an act that occurs at a particular time but also a process or a state that may continue for a period, e. g., until incarceration or release on bail."  Id. at 913

[8] The Lincoln Municipal Code is available online at the City Attorney's Office website, http://www.lincoln.ne.gov/city/attorn/lmc/index.htm.  However, I have not ascertained whether the code sections cited herein were in effect on May 5, 2005.

required, obviously) to take judicial notice of the ordinances.[9]  See Robinson v. Denver City Tramway Co., 164 F. 174 (8th Cir. 1908) (a municipal ordinance is not a public statute, but a mere municipal regulation, which must be pleaded and proved). Cf. McIndoo v. Burnett, 494 F.2d 1311, 1313 (8th Cir. 1974) (federal courts are required to take judicial notice of state statutes and judicial opinions).

The Nebraska statute most comparable to Lincoln Municipal Code § 9.08.050 is Neb. Rev. Stat. Ann. § 28-906(1) (LexisNexis 2003), providing that "[a] person commits the offense of obstructing a peace officer, when, by using or threatening to use violence, force, physical interference, or obstacle, he or she intentionally obstructs, impairs, or hinders . . . the enforcement of a penal law or the preservation of the peace by a peace officer or judge acting under color of his or her official authority . . .."  In fact, the Nebraska Court of Appeals relied upon this statute in State v. Brooks, 560 N.W.2d 180 (Neb.App. 1997), to uphold an arrest and search that occurred under circumstances quite similar to the present case.  The police officers in Brooks observed the defendant urinating in public and decided to arrest him; when the officers commanded the defendant to come toward them, he backed away; one of the officers then placed a hand on the defendant's arm and escorted him to the police cruiser to conduct a pat-down search and to place him under arrest; the defendant refused to put his hands on the cruiser and he kept reaching for his pants' pockets; finally, the officers handcuffed the defendant and searched him, resulting in the discovery of a baggie containing crack cocaine in one of his pants' pockets.  The Nebraska Court of Appeals analyzed the case as follows:

> The foregoing facts establish that the officers were justified in their initial Terry stop after observing Brooks urinating in public. Brooks was directed to approach the officers but, instead, retreated. Under these facts, the officers are permitted under the cases and statutes

---

[9] The provisions of a municipal ordinance are not "adjudicative facts" of which judicial notice may be taken under Federal Rule of Evidence 201.  See 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 201.03[3] (2d ed. 2005).

to pat down Brooks in connection with a <u>Terry</u> stop, where the pat down is limited to a search for weapons.  <u>See</u>, <u>State v. Williams</u>, 249 Neb. 582, 544 N.W.2d 350 (1996); <u>State v. Kimminau</u>, 240 Neb. 176, 481 N.W.2d 183 (1992); <u>State v. Chitty</u>, 5 Neb.App. 412, 559 N.W.2d 511 (1997); § 29-829.  The officers attempted to pat down Brooks in this fashion, but after he had first backed off and then had to be escorted to the cruiser, he repeatedly refused to place his hands on the cruiser, thereby preventing the limited pat down for weapons, which the officers were properly attempting to perform.  This conduct by Brooks impaired and hindered the officers in the performance of their enforcement duties and amounted to an obstruction of a peace officer, in violation of § 28-906. Cases elsewhere have found similar facts to be an obstruction of a police officer. <u>E.g.</u>, <u>State v. Paarmann</u>, 199 Wis.2d 523, 546 N.W.2d 579 (App. 1996) (unpublished opinion) (noting that defendant walking away in contravention of officer's order for pat down was fact in totality of "obstructing"); <u>Burse v. State</u>, 209 Ga.App. 276, 433 S.E.2d 386 (1993) (noting that defendant was properly arrested for obstruction after he was instructed to put his hands on car, and then when officer felt bulge in defendant's pants, defendant took his hand off car and placed it over bulge and refused to remove it when asked).

Obstructing a police officer is a Class I misdemeanor. Because the officers witnessed the misdemeanor of obstructing a peace officer, they were permitted to arrest Brooks, which they did when they handcuffed him.  Thereafter, the officers properly searched Brooks' person as an incident to the arrest.  <u>See</u> <u>Kimminau</u>, <u>supra</u>.

Under the facts of this case, Brooks was properly arrested for obstructing a police officer, and the search incident to that arrest produced the crack cocaine.  Since the search was incident to a lawful arrest, the search was proper.

<u>Id.</u>, 560 N.W.2d at 187-88.

The mere verbal refusal to provide information to an officer does not constitute an obstacle to the enforcement of the penal laws as contemplated by § 28-906.  <u>State v. Owen</u>, 580 N.W.2d 566, 570-71 (Neb.App. 1998); <u>State v. Yeutter</u>, 566 N.W.2d

387, 391 (Neb. 1997).  There must be some sort of physical act in order for a violation of this statute to occur.  <u>Id.</u>  For example, evidence showing that a defendant resisted handcuffing and struggled with an arresting officer will sustain a conviction under this statute.  <u>See</u> <u>State v. Campbell</u>, 620 N.W.2d 750, 757 (Neb. 2001); <u>State v. Lynch</u>, 394 N.W.2d 651, 661 (Neb. 1986).  Under § 28-906, however, the use of force, or threatened use of force, is not always necessary.  The mere act of running away from police constitutes a physical obstacle within meaning of § 28-906.  <u>See</u> <u>In re Interest of Richter</u>, 415 N.W.2d 476, 478 (Neb. 1987).

Because it is undisputed that Mr. Sledge tried to run away, the answer to the question of whether he lawfully could have been arrested for obstructing a peace officer depends solely upon whether the officers were engaged in "the enforcement of a penal law or the preservation of the peace."  The Nebraska Supreme Court has held that: "'Preservation of the peace,' as used in § 28-906(1), means maintaining the tranquillity enjoyed by members of a community where good order reigns."  <u>Id.</u>, citing <u>State v. Sukovaty</u>, 135 N.W.2d 467 (Neb. 1965).  The evidence does not support a finding that Mr. Sledge was disturbing the peace prior to being tackled and handcuffed by the police, but the officers clearly were engaged in the enforcement of a penal law when they detained Mr. Sledge for issuance of a citation.

In <u>Brooks</u>, of course, the Nebraska Court of Appeals held that the police were engaged in a lawful stop-and-frisk.  In the present case, by contrast, I have held that the government has failed to establish the lawfulness of either the detention or the pat-down search.  Quite recently, in <u>State v. Ellingson</u>, No. A-04-837, 13 Neb. App. 931, ___ N.W.2d ___, 2005 WL 2205914, *9 (Sept. 13, 2005), the Nebraska Court of Appeals "assum[ed] without deciding that § 28-906(1) allows a defendant to raise the legitimacy of an investigatory stop in defending a charge of obstructing a peace officer."  Previously, however, in <u>State v. Tierney</u>, 584 N.W.2d 461 (Neb.App. 1998), the Nebraska Court of Appeals affirmed a conviction for obstructing a peace officer while suppressing evidence that was obtained during an unlawful pat-down search

that the defendant physically resisted.  Based upon the <u>Tierney</u> holding, I conclude that there was probable cause to arrest Mr. Sledge for violating § 28-906.

I realize that Officer Clarke arrested Mr. Sledge for "failing to comply," not for obstructing a peace officer, but the Eighth Circuit's holdings in <u>Dawdy</u>, <u>Collins</u>, and <u>Schmidt</u> require an analysis of what an objectively reasonable officer might have done under the circumstances.  <u>See</u> <u>Dawdy</u>, 46 F.3d at 1436 (Lay, J., dissenting) (criticizing majority approach and arguing that attenuation analysis should examine what really happened rather than what could have happened).

In this regard, I note that there is also a Nebraska statute that makes it a felony to escape from official detention.  It provides, in relevant part, that:

> (1) A person commits escape if he unlawfully removes himself from official detention . . .. Official detention shall mean arrest, detention in or transportation to any facility for custody of persons under charge or conviction of crime or contempt or for persons alleged or found to be delinquent, detention for extradition or deportation, or any other detention for law enforcement purposes; . . . .
> . . .
> (3) Irregularity in bringing about or maintaining detention, or lack of jurisdiction of the committing or detaining authority shall not be a defense to prosecution under this section if the escape is from a prison or other custodial facility or from detention pursuant to commitment by official proceedings. In the case of other detentions, irregularity or lack of jurisdiction shall be a defense only if:
> (a) The escape involved no substantial risk of harm to the person or property of anyone other than the detainee; and
> (b) The detaining authority did not act in good faith under color of law.

Neb. Rev. Stat. Ann. § 28-912 (LexisNexis 2003).  A person who "[i]ntentionally engages in conduct which . . . constitutes a substantial step in a course of conduct intended to culminate in his or her commission of the crime" is guilty of criminal attempt under Nebraska law.  Neb. Rev. Stat. Ann. § 28-201(1)(b) (LexisNexis 2003).

Ironically, Mr. Sledge claims that an arrest, albeit unlawful, was effected when Officer Kocian grabbed him (Filing 29, ¶ 4). He "does not challenge Judge Piester's factual determination that Sledge attempted to get away," but emphasizes that "Clarke clearly testified that Kocian grabbed Sledge before Sledge made any effort to run." (Filing 30, p. 8.) I agree with Mr. Sledge that the evidence establishes he was under arrest when he attempted to run away from the officers.

The Nebraska Supreme Court has construed § 28-912(1) in accordance with the American Law Institute Comment to Model Penal Code § 242.6(1), "provid[ing] that the 'any other detention for law enforcement purposes' language does not refer to anything less than custody, but is intended to cover cases where one is incarcerated for law enforcement purposes in a facility not traditionally used to house criminal offenders or those charged with a crime." Hicks, 404 N.W.2d at 925. Thus, "some degree of custody is essential before one can be considered to be in official detention." Id., citing State v. Schlothauer, 294 N.W.2d 382 (Neb. 1980). The Court in Hicks rejected the State's contention that a Fourth Amendment standard (i.e., seizure "by show of authority")[10] applied to the statute, instead holding that there

_____

[10] As summarized by the Eighth Circuit in United States v. Pratt, 355 F.3d 1119, 1122 (8th Cir. 2004):

> The Fourth Amendment itself does not mention arrests or stops; rather it protects individuals from unreasonable "seizures." Traditionally, the term "arrest" denoted a seizure of the person. Dunaway v. New York, 442 U.S. 200, 208, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Thus, all arrests were seizures and vice versa, and probable cause to arrest was always required. Id. A person was, and still is, "seized" by "the slightest application of physical force" or when he submits to a "show of authority." California v. Hodari D., 499 U.S. 621, 625, 628-29, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). The test for a seizure by "show of authority" is objective and asks whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id. at 628, 111 S.Ct. 1547 (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct.

must be "actual or constructive seizure or detention of the person," and that "constructive, as distinguished from physical, restraint sufficient to constitute a constructive seizure or detention of an arrestee exists where an officer has the intention to effect an arrest, that intention has in some way been communicated to the arrestee, the arrestee understands that he is under legal restraint, and the officer has the apparent present power to control the person even though he has not yet asserted physical control." Id., 404 N.W.2d at 926, quoting White, 306 N.W.2d at 911.

In the present case, Mr. Sledge was physically restrained by Officer Kocian before he attempted to flee. There was an actual seizure of his person — in other words, an arrest.[11] Assuming that Officer's Kocian's action was unlawful, Mr. Sledge might defend against a hypothetical escape charge by showing that his own actions did not involve a substantial risk of harm to anyone, and that Officer Kocian did not act in good faith. See § 28-912(2).

It has been held that the existence of an affirmative defense is irrelevant for Fourth Amendment purposes unless the arresting officer has conclusive knowledge of facts establishing the defense. See, e.g., Hodgkins ex rel. Hodgkins v. Peterson, 355 F.3d 1048, 1061 (7th Cir. 2004) ("A police officer may not ignore conclusively

---

1870, 64 L.Ed.2d 497 (1980)).

[11] Mr. Sledge was not constructively seized or detained when Officer Clarke informed him that he was being cited for marijuana possession, nor when Officer Clarke threatened him with arrest if he did not cooperate by keeping his arms up. Under the Hicks standard, the escapee must have known that an arrest was imminent. The Nebraska Court of Appeals' holding in Brooks suggests that there was probable cause to arrest Mr. Sledge under §28-906 when he obstructed the pat-down search by not keeping his arms raised. Such a result, however, would be inconsistent with the Nebraska Supreme Court's admonition that "[t]here must be some sort of physical act in order for a violation of this statute to occur." Yeutter, 566 N.W.2d at 391. Granted, there was a physical act each time Mr. Sledge put his arms down, but the real obstacle to the pat-down search being performed was his refusal to obey the officer's command to keep his arms up.

established evidence of the existence of an affirmative defense, but the officer has no duty to investigate the validity of any defense.") (citations omitted); <u>Fridley v. Horrighs</u>, 291 F.3d 867, 873 (6th Cir. 2002) ("Even if the circumstances suggest that a suspect may have an affirmative defense, if a reasonable officer would not 'conclusively know' that the suspect is protected by the defense, then he is free to arrest the suspect provided there is probable cause to do so.").

In this case, the affirmative defense involves the officers' own conduct, and it must be concluded from the evidence presented that the initial seizure of Mr. Sledge (<u>i.e.</u>, Officer Kocian's grabbing him) was not performed in good faith. The officers acted in good faith when they detained Mr. Sledge, since they could reasonably rely upon the police broadcasts, but no reasonable grounds for the pat-down search have been shown that might permit the officers to physically restrain Mr. Sledge in order to accomplish the search. I therefore conclude that probable cause to arrest Mr. Sledge for attempting to escape from official detention did not exist.

## CONCLUSION

The Fourth Amendment exclusionary rule would have protected Mr. Sledge had he not decided to take matters into his own hands. When Mr. Sledge tried to run away, he forfeited that protection.

IT IS ORDERED that:

1.     Filing 29, Defendant's objections to the Magistrate Judge's report and recommendation are sustained in part and denied in part, as provided above. In particular, the court denies Defendant's objection to the Magistrate Judge's conclusion that Defendant was lawfully arrested before being searched, and Defendant's objections to fact findings that he attempted to flee and that he was known to be noncompliant when confronted by police.

2.      The Magistrate Judge's recommendation (filing 26) is adopted.

3.      Defendant's motion to suppress (filing 14) is denied in all respects.

September 26, 2005.                          BY THE COURT:

                                             s/ *Richard G. Kopf*
                                             United States District Judge